# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1655

_____

Kerrey Buser, M.D.,        *
       *
       Appellant,        *
       *
       *   Appeal from the United States
       v.        *   District Court for the
       *   District of Nebraska.
Richard Raymond, M.D., Chief    *
Medical Officer for the State of    *
Nebraska, Individually and in his   *
Official Capacity; Randy T. Kohl,   *
M.D., Individually and in his Official   *
Capacity; Joseph C. Scott, Jr., M.D.,   *
Individually and in his Official    *
Capacity; Arthur A. Weaver, D.O.,   *
Individually and in his Official    *
Capacity; Kay Kahla, Individually and   *
in her Official Capacity; John L. Reed,   *
M.D., Individually and in his Official   *
Capacity; Gordon D. Adams;    *
Susan Eilts, Individually and in her   *
Official Capacity; Deb Ford,    *
Individually and in her Official    *
Capacity; James D. Smith, Individually   *
and in his Official Capacity,    *
       *
       Appellees.        *

_____

Submitted: November 13, 2006
Filed:  February 7, 2007

_____

Before RILEY, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Kerry B. Buser, M.D., sued members of the Nebraska Board of Medicine and Surgery ("the Board"), Richard Raymond, M.D., Chief Medical Officer of Nebraska ("CMO"), and the Nebraska Attorney General (collectively "appellees") for civil rights violations. Buser's suit alleged that the Board's practice of using the CMO—an absentee judge—during physician disciplinary hearings violated his due process rights under 42 U.S.C. § 1983. Appellees subsequently filed a motion to dismiss, asserting, *inter alia*, that Dr. Buser failed to state a cause of action against Dr. Raymond under the absolute immunity doctrine. The district court[1] granted appellees' motion to dismiss all claims against Dr. Raymond, finding that Dr. Raymond was entitled to absolute immunity. We affirm.

I. *Background*

The Nebraska Uniform Licensing Law contains the investigative, prosecutorial, and disciplinary process governing all Nebraska physicians. Neb. Rev. Stat. § 71-101 *et seq*. The statute empowers the Board to regulate the practice of medicine and surgery in Nebraska, including the power to review and screen complaints against physicians and make findings and disciplinary recommendations to the Nebraska Attorney General. *Id*. § 71-168.01(5).

The Board's general administration and acts are subject to oversight by the Department of Health and Human Services Regulation and Licensure ("the Department"). *Id*. § 71-121.01. The Department may also initiate investigations against physicians and, after completing its investigation, consult with the Board to

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

receive its recommendations for submission to the Attorney General. *Id.* § 71-168.01(5).

The statute makes the director of the Department responsible for hearing and deciding disciplinary complaints against physicians. Notably, the statute also authorizes appointment of the CMO to perform the director's duties. *Id.* §§ 71-155, 155.01. Such duties include the authority to revoke, suspend, or place limitations on a license. *Id.* § 71-150. The CMO is responsible for appointing a hearing officer to preside over the physician's disciplinary hearing. Neb. Admin. Code, Title 184, Ch. 1, § 008.01A. As the presiding official, the hearing officer may place witnesses under oath, issue subpoenas, rule on objections, and generally control the course of the proceedings. *Id.* § 008.02A. The CMO may permit the hearing officer to recommend findings of fact, conclusions of law, and disposition. *Id.* § 008.02B. After the hearing, the CMO has the power to make findings of fact and conclusions of law. *Id.* § 013.01 The physician may appeal the CMO's final decision to the state district court under the Administrative Procedures Act. Neb. Rev. Stat. § 71-159.

Dr. Buser is subject to the Nebraska Licensing Law, as he operates a surgical medical practice in Lexington, Nebraska, and is licensed in Nebraska. Prior to October 2, 1998, the Board investigated a complaint made against Dr. Buser, containing seven causes of action. Based upon the Board's recommendation, the Nebraska Attorney General filed a Petition for Disciplinary Action against Dr. Buser. At the time of the investigation, Dr. Raymond was the CMO. Dr. Buser's hearing, however, was conducted before Hearing Officer Terry R. Schaaf. After the hearing, both Dr. Buser and the State submitted written summaries to Dr. Raymond. Dr. Raymond, as CMO, subsequently issued findings of fact and conclusions of law, dismissing two of the seven causes of action, limiting Dr. Buser's license to practice medicine for one year, and ordering Dr. Buser to pay a civil penalty of $5,000.00 within 90 days of the date of the order.

Both Dr. Buser and the State appealed the decision to the District Court of Lancaster County under the Administrative Procedures Act. The state court affirmed Dr. Raymond's decision. Neither party took any further appeal. Dr. Buser then filed this § 1983 action in federal district court, alleging that his due process rights were violated by the named defendants. The district court granted appellees' motion to dismiss for failure to state a claim, finding that Dr. Raymond was entitled to absolute immunity.

## II. *Discussion*

Dr. Buser appeals the district court's grant of absolute immunity to Dr. Raymond, arguing that Dr. Raymond, as CMO, is not entitled to absolute immunity because (1) due process requires the presence of the CMO at physician disciplinary hearings and (2) the disciplinary process contains inadequate safeguards, as the CMO's sole function is to "step in at the last stage of the process and issue his findings of fact, conclusions of law and disciplinary sanctions without ever participating in the hearing process."

We review de novo a district court's grant of a motion to dismiss. *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 788 (8th Cir. 2006).

"[I]n a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity . . . subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Butz v. Economou*, 438 U.S. 478, 507 (1978). Such "exceptional situations" include "situations arising when executive department officials . . . functionally serve in capacities comparable to judges, prosecutors and jurors." *Horwitz v. State Bd. of Med. Exam'rs of State of Colo.*, 822 F.2d 1508, 1514 (10th Cir. 1987). Thus, officials performing quasi-judicial actions are entitled to absolute immunity. *VanHorn v. Oelschlager*, 457 F.3d 844, 847 (8th Cir. 2006).

Whether an executive official, body, or committee is entitled to absolute immunity "turns on a number of factors," which are:

"(a) the need to assure that the individual can perform his [or her] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal."

*Krueger v. Lyng*, 4 F.3d 653, 656 (8th Cir. 1993) (quoting *Brown v. Griesenauer*, 970 F.2d 431, 438 (8th Cir. 1992)) (alteration in original) (holding that suspension "hearing" process was not an adversary one because (1) petitioner "was not given an opportunity to call witnesses of his own or to cross-examine the witnesses against him"; instead, "the testimony received was in the form of letters from disgruntled employees who were not present at the hearing and whose statements were not given under oath"; (2) "there was little probability that any errors in the committee proceeding, which limited its consideration to employee allegations against [the petitioner], would be corrected on appeal because when the matter was heard by the hearing examiner, he too refused to permit evidence that would have tended to establish that [the petitioner] was discharged because of his whistle-blowing activities"; and (3) rather than functioning as a review board, the members of the committee acted "simply as a discharging authority").

Several of our sister circuits have addressed claims brought by physicians against state boards of medical examiners. "Every court of appeals that has addressed the issue has concluded that members of a state medical disciplinary board are entitled to absolute quasi-judicial immunity for performing judicial or prosecutorial functions." *Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir. 1999) (citing *O'Neal v. Miss. Bd. of Nursing,* 113 F.3d 62, 65–67 (5th Cir. 1997); *Wang v. New Hampshire Bd. of Registration in Med.,* 55 F.3d 698, 701 (1st Cir. 1995); *Watts v. Burkhart,* 978

F.2d 269, 272–78 (6th Cir. 1992) (en banc); *Bettencourt v. Bd. of Registration in Med. of Commonwealth of Mass.,* 904 F.2d 772, 782–84 (1st Cir. 1990); *Horwitz,* 822 F.2d at 1512–16)). *But see DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) (holding that New York medical officials were not entitled to absolute immunity from radiologist's due process claims arising from summary suspension of medical license).[2] Even where

---

[2]In *DiBlasio*, the Second Circuit concluded that New York medical officials were not entitled to absolute immunity from a radiologist's due process claims. *DiBlasio*, 344 F.3d at 297–302. In that case, the New York Board for Professional Medical Conduct assigned the Director of Medical Fraud Unit of the Office of Medical Professional Conduct to investigate the radiologist's rate of error in detecting cancer. *Id*. at 294. Following her investigation, the Director recommended that the New York State Department of Health temporarily suspend the radiologist's license pursuant to the summary suspension procedures. *Id.* The radiologist subsequently received a letter from the Director stating that he was being investigated for professional misconduct and that a scheduled meeting between the radiologist and the Director was related to that investigation. *Id*. The letter did not advise the radiologist of his right to be represented by counsel. *Id*. at 295. After the scheduled meeting, the Commissioner of the New York State Department of Health summarily suspended the radiologist's medical license and, through the Board, issued a Statement of Charges. *Id*. Two months after the summary suspension, a hearing committee of the Office of Medical Professional Conduct began an evaluation of whether the summary suspension should be continued pending final resolution of the misconduct charges. *Id*. It ultimately found no basis for the continued suspension of the license. *Id*. The Commissioner, however, rejected the hearing committee's recommendation and ordered the continuation of the complete suspension of the radiologist's license. *Id*. The radiologist then brought suit in federal district court, alleging substantive due process claims based on purported misconduct during the investigation and summary suspension proceedings. *Id*.

On appeal, the Second Circuit concluded that New York's summary suspension procedure "lacks sufficient similarity to the judicial process to warrant absolute immunity from suit for involved officials." *Id*. at 297. The court found that the summary suspension procedure lacked meaningful safeguards against arbitrary executive action because (1) "the Board's hearing committee has the power to suggest a course of action only, while the commissioner has the final authority to summarily

an official is "not a Board member, and thus he is one step removed from the 'judicial' function of the Board, he nevertheless may be entitled to absolute quasi-judicial immunity if he is engaged in a protected [ ] function." *Ostrezenski*, 177 F.3d at 249.

For example, in *Bettencourt*, the First Circuit held that a member of the medical board who "weighs evidence, makes factual and legal determinations, chooses sanctions, writes opinions explaining his decisions, serves a set term . . . and can be removed only for cause" is "functionally comparable" to a judge. *Bettencourt*, 904 F.2d at 783. The court also determined that the act of revoking a doctor's license "is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity apparent." *Id*. Finally, the court addressed the adequacy of procedural safeguards. *Id*. The court explained that, after the hearing officer issued his decision, the board "then reviews the hearing officer's decision and issues its own 'final decision,' which also contains a statement of reasons and a determination of factual and legal issues." *Id*. at 774. In making its factual determinations, the board has

suspend a physician's license"; (2) "although the hearing committee must initiate suspension proceedings, the independence of that body is severely undermined by the commissioner's appointment and removal powers"; and (3) "the post-deprivation hearing before the Board's hearing committee provides no real check on the commissioner's conduct," as the commissioner may freely reject the hearing committee's recommendation that the suspension be lifted. *Id*. at 299.

Additionally, the court determined that the Commissioner's role in the summary suspension process was not "sufficiently analogous to that of a judge or prosecutor, respectively, to warrant absolute immunity from suit." *Id*. at 300. While the Commissioner possesses the ultimate authority to summarily suspend a physician's license, the Commissioner does not issue subpoenas or regulate the course of any hearings. *Id*. Instead, the Commissioner "wear[s] several hats" by being overseer of the investigation, initiator of charges and summary proceedings, and final arbiter of the decision. *Id*. This "blending of roles" "unduly risks compromising the independence and neutrality of the commissioner's judgment." *Id*. Therefore, the court held that the Commissioner was not entitled to absolute immunity. *Id*.

to give substantial deference to the hearing officer's credibility determinations "but is free to revise or reject the findings of a hearing officer on conflicting evidence." *Id.* The board reviews all legal issues de novo. *Id.* The court held that such procedures were adequate, as (1) the physician may be represented by counsel; (2) there is a board prosecutor; (3) the physician has access to a transcribed record; (4) the hearing officer writes a tentative decision; (5) the regulations allow for oral and documentary evidence and cross-examination; and (6) the Supreme Judicial Court of Massachusetts directly reviews the board's decision. *Id.* at 783.

Applying the absolute immunity factors to the present case, we conclude that Dr. Raymond is entitled to absolute immunity. First, the need to assure that Dr. Raymond, as CMO, can perform his functions without harassment or intimidation weighs in favor of absolute immunity. As the First Circuit recognized in *Bettencourt*, Dr. Raymond's decision to revoke or suspend a physician's license likely exposes him to the threat of litigious parties.

Second, Dr. Raymond's entitlement to absolute immunity is not overcome by Dr. Buser's claimed deprivation of due process rights due to the CMO's absence at the hearing before the hearing officer. The purpose of absolute immunity is to insulate officials performing quasi-judicial functions from liability for alleged unconstitutional acts. *See Butz*, 438 U.S. at 507 ("We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity . . . subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business."). Thus, if adequate safeguards exist in the hearing process and the CMO's duties are "functionally comparable" to that of a judge, such factors weigh in favor of absolute immunity.

We conclude that the hearing process contains adequate safeguards. Dr. Buser was permitted to call witnesses, present evidence, testify, obtain a decision, and appeal

to the state district court. Additionally, like the board members in *Bettencourt*, Dr. Raymond's duties as CMO are "functionally comparable" to that of a judge, as the CMO is permitted to weigh evidence, make factual determinations, and render a decision. Just as the board members in *Bettencourt* were permitted to make their own findings of fact and conclusions of law—albeit giving substantial deference to the hearing officer's credibility determinations—Dr. Raymond, as CMO, makes his findings of fact and conclusions of law after independently reviewing the record.

Dr. Buser relies on *DiBlasio* to support his argument that the CMO is not a judicial officer because all the CMO does is "step in at the last stage of the process and issue findings of fact, conclusions of law and disciplinary sanctions without ever participating in the hearing process." However, the *DiBlasio* case is distinguishable on four grounds. One, in *DiBlasio*, after the hearing committee made its evaluation and recommendation, the Commissioner could summarily suspend the physician's license absent meaningful review. Here, after the hearing officer holds the hearing, the CMO independently reviews the record to make findings of fact and conclusions of law before disposition. Two, unlike in *DiBlasio* where the Commissioner had the power to appoint and remove the members of the hearing committee, there is no indication in the record that once the CMO appoints the hearing officer, he has the power to remove the hearing officer. Three, while the court in *DiBlasio* concluded that there was no meaningful opportunity for review, in the present case, any decision made by the CMO is appealable under the Administrative Procedures Act. Four, the Commissioner in *DiBlasio* "wore several hats" by overseeing the investigation, initiating the charges and summary proceedings, and acting as a final arbiter; in contrast, the CMO plays no part in initiating the investigation and instead possesses the judicial powers of administering oaths and issuing subpoenas for witness testimony and document production. Neb. Rev. Stat. § 75-155(1). Therefore, *DiBlasio* is inapposite to the instant case.

Third, as to the CMO's insulation from political influence, although the CMO is appointed by the governor, reports to the governor, serves full time at the pleasure of the governor, and is subject to confirmation by a majority vote of the legislature, we have never held that this factor is determinative. We have previously granted absolute immunity to officials who have been appointed by the governor. *See Dunham v. Wadley*, 195 F.3d 1007, 1010–11 (8th Cir. 1999) (stating that members of the Arkansas Veterinary Medical Examining Board were appointed by the governor for five-year terms); *VanHorn*, 457 F.3d 844, 847 (8th Cir. 2006) (stating that members of the Nebraska State Racing Commission were appointed by the governor and confirmed by the legislature).

Fourth, regarding the importance of precedent, because no evidence exists in the record as to whether the CMO relies on precedent in rendering his decision, this factor neither weighs in favor nor against granting absolute immunity.

Fifth, considering the adversary nature of the process, Dr. Buser conceded in his second amended complaint that the administrative hearing is an adversarial process, stating that "the administrative hearing process . . . by law, is an adversarial process. . . ."

Finally, an erroneous decision by the CMO is correctable on appeal, as the Administrative Procedures Act states that "[b]oth parties shall have the right of appeal and the appeal shall be in accordance with the Administrative Procedures Act." Neb. Rev. Stat. § 71-159. The physician may appeal the CMO's decision to the state district court in the county where the action takes place. *Id*. § 84-917.

Because a majority of the absolute immunity factors weigh in favor of granting Dr. Raymond absolute immunity, we hold that the district court did not err in dismissing Dr. Buser's § 1983 action based upon absolute immunity.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

BEAM, Circuit Judge, concurring.

I concur in the opinion of the court, but write separately to express my concern over the Nebraska licensing procedures at issue in this very close case. As the Second Circuit noted in DiBlasio v. Novello, 344 F.3d 292 (2d Cir. 2003), and as discussed in footnote 2, ante at 6-7, a state medical official may be denied absolute immunity if his or her role is too dissimilar to that of an official in a judicial proceeding. In my view, the structure of the Nebraska medical license revocation procedure comes dangerously close to the New York procedure struck down in DiBlasio.

I stress this because of the limited amount of review available to litigants in the Nebraska system. The appeal to the state district court, taken under the Administrative Procedures Act and much relied upon by the State as a procedural safeguard, is an extremely limited re-examination based on the agency record. See Neb. Rev. Stat. § 84-917. I think Nebraska should carefully consider how it carries out its medical licensing revocation procedure, without undue reliance on the narrow review available in state district court, to ensure that the actions of Nebraska's CMO are well within the protections of absolute immunity and that all litigants are afforded ample due process. In this regard, it would appear to me to be more constitutionally sound for the hearing officer, who sees and hears the witnesses, views their demeanor, and is better able to judge their credibility, to make the necessary findings of fact, subject to a record review by the CMO.

For the reasons stated in the court's opinion, I concur.

_____

-11-