# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEVIN RAY BUCKWALTER,
　　　　　　*Plaintiff-Appellant,*

v.

STATE OF NEVADA BOARD OF
MEDICAL EXAMINERS; SOHAIL U.
ANJUM; JAVAID ANWAR; S. DANIEL
MCBRIDE; VAN HEFFNER; EDWARD
COUSINEAU,
　　　　　*Defendants-Appellees.*

No. 11-15742

D.C. No.
2:10-cv-02034-KJD

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
February 16, 2012—San Francisco, California

Filed April 26, 2012
Amended June 8, 2012

Before: Betty B. Fletcher, John T. Noonan, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Jacob Hafter and Michael Naethe, Law Office of Jacob L. Hafter & Associates, Las Vegas, Nevada, for the plaintiff-appellant.

Frank Gilmore and Michael E. Sullivan, Robison Belaustegui Sharp & Low, Reno, Nevada, for the defendants-appellees.

## ORDER

The opinion filed on April 26, 2012 is amended as follows. The phrase <Edward Cousineau, a Board Member>, appearing on page 4447 of the Slip Opinion, is replaced with the following text: <Edward Cousineau, the Board's Executive Director>.

An amended opinion is filed concurrently with this order.

Judge Paez has voted to deny the petition for rehearing en banc. Judge B. Fletcher and Judge Noonan so recommend. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED. No further petitions for rehearing or rehearing en banc may be filed in response to the amended opinion.

---

**OPINION**

PAEZ, Circuit Judge:

Kevin Ray Buckwalter, M.D., appeals the district court's dismissal of claims he brought against the members of the Nevada State Board of Medical Examiners ("Board Members"), in their individual capacities, under 42 U.S.C. § 1983. Buckwalter alleged that the Board Members deprived him of his constitutional rights when, in an ex parte emergency proceeding, they summarily suspended his authority to prescribe medication. The issues presented for review are (1) whether the Board Members are entitled to absolute immunity from liability for the exercise of their summary authority, and (2) whether *Younger* abstention proscribes the federal courts from hearing Buckwalter's case while the state proceedings are pending.

We hold that the Board Members are absolutely immune from Buckwalter's claims for money damages, and that *Younger* abstention bars Buckwalter's claims for equitable relief. We therefore affirm.

## I.   Background

Dr. Buckwalter has been a licensed physician in Nevada since 1997. In 2006, the Nevada State Board of Medical Examiners ("the Board") began to investigate citizen complaints that Dr. Buckwalter was overprescribing narcotic analgesics. The Board's Investigative Committee ordered a peer review of the results of the investigation to determine whether Buckwalter's conduct as a physician was consistent with pre-

vailing professional standards. Two peer reviewers concluded that in several instances, Buckwalter's conduct fell below the minimum standard of care.

Edward Cousineau, the Board's Executive Director, filed a formal administrative complaint with the Board. The complaint charged Buckwalter with three counts of wrongdoing and alleged that he was an imminent threat to the health and safety of his patients. On that basis, Cousineau asked the Board to summarily suspend Buckwalter's authority to prescribe or administer controlled substances.

On November 12, 2008, the Board convened an emergency telephone meeting to review the complaint and summary suspension request. Buckwalter was not notified of the charges against him or offered an opportunity to participate in the meeting. In the meeting, the Board Members concluded that there was sufficient evidence that Buckwalter posed a danger to public welfare to justify the summary suspension of his authority to prescribe, administer, and dispense controlled substances in Nevada. The Board Members also scheduled a full hearing on the administrative complaint for March 18, 2009, as well as a prehearing conference for early February. The Board immediately notified Buckwalter of the summary suspension and the hearing schedule.

In the months following the summary suspension, the parties worked to reach a settlement. On the eve of the hearing date, Buckwalter and the Board entered into a joint stipulation to vacate the hearing in anticipation of a finalized settlement. Ultimately, however, the full Board voted to reject the proposed settlement. Buckwalter did not withdraw from the stipulation or demand that a hearing be reset, opting instead to attempt to reach a new settlement that would pass muster with the Board.

The parties never reached a mutually satisfactory agreement, and in November 2010 Buckwalter commenced this

action under 42 U.S.C. § 1983 in the District of Nevada, charging the Board and its members with depriving him of constitutional due process. The complaint alleged that the Board Members denied Buckwalter due process first by summarily suspending his prescribing privileges, and second by failing to promptly conduct a postdeprivation hearing following the summary suspension.

The district court dismissed all of Buckwalter's claims, holding that they were barred by absolute immunity and, in the alternative, that *Younger* abstention precluded a federal court from hearing the case. Buckwalter timely appealed.

## II.    Standard of Review

"Whether a public official is entitled to absolute immunity is a question of law that is reviewed de novo." *Miller v. Davis*, 521 F.3d 1142, 1145 (9th Cir. 2008) (quoting *Goldstein v. City of Long Beach*, 481 F.3d 1170, 1172 (9th Cir. 2007)). "We review de novo the district court's decision to abstain under the *Younger* doctrine." *Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 881 (9th Cir. 2011).

We also review de novo a district court's order dismissing a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003). We assume that Buckwalter's allegations of fact are true and analyze them in the light most favorable to his claims. *See id.*

## III.    Discussion

### A.    *Absolute immunity.*

[1] State and federal executive officials[1] are absolutely

---

[1] Buckwalter's suit also names the Nevada State Board of Medical Examiners as a defendant. The Eleventh Amendment proscribes § 1983

immune from § 1983 suits if they perform " 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993) (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)).

**[2]** It is the "nature of the function performed, not the identity of the actor who performed it," that determines whether an official is cloaked by absolute immunity. *Id.* at 269. The paradigmatic functions giving rise to absolute immunity are those of judges and prosecutors. *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 841-42 (9th Cir. 2010) (quoting *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)). Absolute immunity is also accorded to officials of government agencies "performing certain functions analogous to those of a prosecutor" or a judge. *Butz*, 438 U.S. at 515.

To determine whether a particular state officer's role is "functionally comparable" to that of a judge, we consider six nonexclusive factors, decocted from *Butz*, that indicate a judicial function:

> "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal."

claims against the Board itself, whether for damages or injunctive relief. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). Hence, the only issue in this appeal is the liability of the Board Members in their individual capacities.

*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz*, 438 U.S. at 512). If, upon applying these "*Butz* factors," we determine that an official was functioning in a judicial or quasi-judicial capacity when he undertook the act giving rise to the § 1983 suit, then absolute immunity protects him from liability. *Id.* An official cannot be subjected to responsibility in a civil action, "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Id.* at 199-200 (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1872)).

**[3]** We have previously held that members of state medical boards are "functionally comparable to judges" and thus "entitled to absolute immunity for their quasi-judicial acts." *Mishler v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999). But that does not settle this case: the protection of absolute immunity reaches "only those actions that are judicial or closely associated with the judicial process." *Id.* (quoting *Buckley*, 509 U.S. at 273). And Buckwalter contends that two acts by the Board Members were nonjudicial and therefore outside the ambit of absolute immunity: (1) their summary suspension of his prescribing privileges and (2) their failure to provide him a prompt postdeprivation hearing. We consider each act in turn.

### 1.   *The summary suspension.*

In *Mishler*, we held that absolute immunity applies to "acts occurring during the disciplinary hearing process." *Id.* at 1008. Buckwalter argues that when the Board Members exercise their emergency summary suspension authority, they should not enjoy the same immunity that they do when they conduct formal disciplinary hearings.

**[4]** Determining whether *Mishler*'s rationale extends to a prehearing summary suspension requires us briefly to review the operation of the two Nevada statutes that define the Board's disciplinary authority, as those statutes appeared in 2008: Chapter 630 of the Nevada Revised Statutes, and the

Nevada Administrative Procedure Act, Nevada Revised Statutes § 233B.[2]

Chapter 630 specifies that once the Board receives a complaint about a physician, an investigative committee reviews it to determine whether is has a reasonable basis. *See* Nev. Rev. Stat. § 630.311. If the investigation substantiates the complaint, the Board may bring formal charges against the physician and set a hearing date. *Id.* § 630.339. Physicians facing discipline must receive notice of the charges, the hearing date, and any possible sanctions; they are also entitled to representation by counsel and the right to present evidence on any relevant issue. *See id.*; *id.* § 233B.121.

Section 127 of the Nevada Administrative Procedure Act empowers the Board to summarily suspend a medical license if "the agency finds that public health, safety or welfare imperatively require emergency action, and incorporates a finding to that effect in its order." *Id.* § 233B.127. Following a summary suspension, however, a formal administrative hearing "must be promptly instituted and determined."[3] *Id.*

The defendants in *Mishler*—also members of the Nevada State Board of Medical Examiners—did not summarily suspend the plaintiff's license; they revoked it after an administrative hearing. *See* 191 F.3d at 1001. We concluded that five of the six *Butz* factors militated in favor of absolutely immu-

---

[2]Unless we indicate otherwise, subsequent citations refer to the 2008 versions of these statutes.

[3]In 2009, the legislature amended the statute to require the Board to initiate postdeprivation hearings within 45 days:

> Proceedings relating to the order of summary suspension must be instituted and determined within 45 days after the date of the order unless the agency and the licensee mutually agree in writing to a longer period.

Nev. Rev. Stat. § 233B.127(3) (West 2011).

nizing the board members from liability for that action. *Id.* at
1005-07.

First, we *noted that an agency whose raison d'etre* is to dis-
cipline medical professionals is likely to provoke frequent liti-
gation. *See id.* at 1005. Given the vital public-welfare interests
at stake, the court concluded that there was a " 'strong need'
to make certain that Board Members [could] perform these
disciplinary functions without the threat of harassment or
intimidation." *Id.*

Second, we opined that it was "difficult to dispute" that
adequate procedural safeguards trammeled the Board Mem-
bers' authority. *Id.* The "comprehensive umbrella of statutes"
governing the Board's conduct created procedural safeguards
akin to those available under federal administrative law. *Id.* at
1005-06; *see also Butz*, 438 U.S. at 514 ("[T]he Administra-
tive Procedure Act contains a number of provisions designed
to guarantee the independence of hearing examiners. . . . In
light of these safeguards, we think that the risk of an unconsti-
tutional act by one presiding at an agency hearing is clearly
outweighed by the importance of preserving the independent
judgment of these men and women.").

Reviewing the third factor—the Board Members' insulation
from political influence—we concluded that the Board Mem-
bers were sufficiently independent because they were
appointed by the governor and removable only for good
cause. *Id.* at 1007.

The fourth *Butz* factor, the importance of precedent, was
the only one that we felt did not weigh in favor of absolute
immunity. *See id.* at 1007 ("It is unclear from the record to
what extent the Nevada Board relies on precedent in making
its disciplinary decisions."). The fifth and sixth factors, how-
ever, buttressed the case that the Board Members were judi-
cial homologues when performing their disciplinary
functions:

> [I]t is clear that the disciplinary process is adversary in nature and that errors made by the Board are correctable on appeal. Physicians are entitled to representation by counsel and may present evidence at a formal disciplinary hearing. The decision of the Board must be in writing and contain the Board's findings and any sanctions. Judicial review of the Nevada Board's decision is available.

*Id.* (internal citations omitted).

Viewing the six factors as a totality, we held that the Board Members were functionally comparable to judges, and that adjudicating license-revocation hearings was a quasi-judicial act for which they were absolutely immune from liability. *Id.*

**[5]** The calculus is obviously somewhat different in the context of emergency summary suspensions. In Nevada, summary suspension proceedings entail substantially fewer procedural protections for physicians: they are nonadversarial (and often ex parte), they employ an indeterminate burden of proof, and they are not subject to the various procedural strictures that govern formal disciplinary hearings. And although the Board is required to institute a formal hearing after a summary suspension, Nevada law only requires that it be "promptly instituted"—a vague directive that raises the possibility of coercive delays.[4] Nev. Rev. Stat. § 233B.127.

Indeed, Buckwalter's own experience demonstrates the parsimony of the procedural safeguards built into the summary suspension procedure. He received no notice of the emer-

---

[4]As we noted *supra* at note 3, Nevada has since strengthened the procedural protections afforded to physicians in summary suspension proceedings by adopting a bright-line requirement that hearings be instituted within 45 days of the entry of a summary suspension order. *See* Nev. Rev. Stat. § 233B.127(3) (West 2011). Nonetheless, we consider whether the Board Members were entitled to absolute immunity given the dispensation in effect at the time Buckwalter's privileges were suspended.

gency ex parte telephone conference in which his prescribing privileges were suspended. He had no opportunity to contest the charge that he was a danger to the public before the Board Members curtailed his professional authority. And the revocation hearing date the Board scheduled was to have taken place more than four months after the summary suspension. The Board Members may have considered a four-month wait reasonable. Buckwalter, whose livelihood was at stake, presumably did not.

**[6]** In spite of these procedural deficiencies, we are convinced that the Board Members' summary suspension power is a judicial function. The *Mishler* court's application of the *Butz* factors to the Board Members' disciplinary hearing authority largely applies to their summary suspension authority. First, the Board Members' interest in performing their functions free from harassment is at its apex when a physician poses a serious threat to public safety. *See Mishler*, 191 F.3d at 1005 ("In view of the public interest of ensuring quality health care, there is a strong need to make certain that Board Members can perform these disciplinary functions without the threat of harassment or intimidation." (internal quotation marks omitted)). Abrogating absolute immunity for summary suspensions could make Board Members hesitant to act quickly and decisively to protect the public.

**[7]** Second, though summary suspension proceedings lack the procedural safeguards of formal disciplinary hearings, state law provides that whenever the Board Members exercise their summary suspension power, a formal hearing ineluctably follows. The Board Members' temporary emergency judgment is thus necessarily tested in the crucible of an administrative hearing with a full complement of procedural safeguards. Had Buckwalter opted to go forward with the disciplinary hearing instead of stipulating to postpone it, he would have received precisely the due process that the physician in *Mishler* did. The same logic extends to the fifth *Butz* factor, the adversary character of the proceeding. Summary

suspensions are effectively adversary because they are subject to mandatory postdeprivation review.

Buckwalter argues that the safeguard of a mandatory post-deprivation hearing is inadequate, because the requirement that the hearing be "promptly instituted and determined" is too vague to provide meaningful due process. Nev. Rev. Stat. § 233B.127. There is no indication, however, that the Board exercised its implicit discretion to interpret the term "promptly" in an abusive manner in Buckwalter's case. *Cf. Cassim v. Bowen*, 824 F.2d 791, 798 (9th Cir. 1987) ("[W]e are unwilling to invalidate a statute because it might, but need not, be applied in an unconstitutional manner.") (quotation marks omitted). In the emergency suspension meeting, the Board Members set dates for both a formal hearing and a prehearing conference and immediately informed Buckwalter of the schedule. Buckwalter did not complain at the time that the Board Members were being dilatory. Four months is not swift process, but neither is it unreasonably slow. *See id.* at 799 (postdeprivation hearing delay of four or five months is sufficiently prompt to provide due process). We are persuaded that § 233B.127 is a sufficient restraint on improper use of the Board's summary powers.

The third factor is the Board Members' insulation from political influence. In *Mishler*, we concluded that "the structure of the Nevada Board and the procedural requirements of their decisionmaking process show that the Board Members are sufficiently insulated from political influence." 191 F.3d at 1007. Buckwalter argues that the "real world of Nevada politics" belies that judgment. He alleges that the Board Members pursued Buckwalter's case and refused to settle it to burnish the Board's image in the wake of a public scandal involving the reuse of medical supplies at an outpatient endoscopy center.

Judicial independence is a structural characteristic, not an empirical one. The question is whether the conditions of an

official's employment tend to promote independent judgment, not whether a particular decision was affected by the official's cognizance of current events. *See Cleavinger*, 474 U.S. at 203-04 (noting that members of a prison disciplinary committee are not independent because they are "direct subordinates of the warden"); *see also Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011) (explaining that the life tenure and salary protections of Article III were adopted to create the conditions under which judges would be likely to act free from improper influence). We have already held that the structure of the Board shows that its Members are sufficiently insulated from political influence. *See Mishler*, 191 F.3d at 1007. Even if Buckwalter's claim that a scandal influenced the Board Members' behavior is true, that fact does not gainsay the Board Members' political independence. After all, "[j]udges do not exist in a vacuum." *Hoptowit v. Ray*, 682 F.2d 1237, 1261 (9th Cir. 1982), *abrogated on other grounds by Sandin v. O'Connor*, 515 U.S. 472 (1995).

**[8]** As was true in *Mishler*, the fourth *Butz* factor points in neither direction, because it is unclear whether the Board Members rely on precedent when they exercise their summary authority. *Id.* But the last *Butz* factor, the correctability of errors on appeal, favors absolute immunity: an erroneous summary suspension may be corrected in either the postdeprivation hearing or in Nevada state court in a subsequent appeal. *See* Nev. Rev. Stat. § 630.356(1) ("Any person aggrieved by a final order of the Board is entitled to judicial review of the Board's order.").

Buckwalter raises two arguments that errors of judgment in the Board Members' exercise of the summary suspension authority are insufficiently correctable. First, he points out that summary suspension proceedings and postdeprivation hearings involve different questions. In a disciplinary hearing, the Board asks whether a physician's malpractice merits the permanent deprivation of his license. In a summary suspension hearing, by contrast, it asks whether a physician is an

imminent danger to public safety. For that reason, argues Buckwalter, the Board might conduct a disciplinary hearing and find a physician not guilty of the charges in the administrative complaint without ever addressing the propriety of the summary suspension.

Whatever distinction there is between these inquiries is without a difference. In Buckwalter's case—and, we suspect, in the mine run of such cases—the allegations of past malpractice were the basis of the Board's concern about the threat to future patients. (Presumably, a serial malpractitioner virtually always imperils the public.) Had the disciplinary hearing occurred, the allegations of malpractice might have been proved true, vindicating the Board's decision to suspend Buckwalter's privileges until he had undergone rehabilitative discipline. Or they might have been proved false, nullifying the summary suspension and restoring Buckwalter's reputation. In either case, the Board would have effectively adjudicated the merits of the suspension.

Second, Buckwalter argues that the statutory scheme lacks an adequate mechanism for correcting errors because Nevada law prohibits a state court from staying a Board order while an appeal is pending. *See* Nev. Rev. Stat. § 630.356(2). In Buckwalter's view, the fact that he cannot obtain a stay of the summary suspension vitiates the right of appeal.

The unavailability of a stay makes the consequences of an error by the Board more severe, but it has no bearing on whether the error is ultimately correctable. Nevada may preclude a stay as it sees fit. *See State ex rel. Kassabian v. State Bd. of Med. Exam'rs*, 235 P.2d 327, 332 (Nev. 1951) (affirming the right of the legislature to prohibit Nevada courts from staying an order of the state medical board). What matters for our purposes is that judicial review is available.[5]

___

[5]Buckwalter also argues, albeit in a footnote, that the prohibition on staying a Board order violates the Nevada state constitution by trenching on the state courts' constitutionally guaranteed power to issue writs of injunction. *See* Nev. Const. art. 6, § 1. Because this is an action for deprivations of federal constitutional rights, we need not address this argument.

Buckwalter urges us to follow *DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003). In *DiBlasio*, the Second Circuit refused to extend absolute immunity to employees of the New York State Department of Health who summarily suspended a radiologist's medical license under New York Public Health Law § 230. *Id.* at 298-302.

*DiBlasio* is of little use to Buckwalter, however, because the New York statutory scheme governing summary suspensions is fundamentally different from that of Nevada. New York law empowers the Commissioner of the State Department of Health to unilaterally suspend a physician's license following an investigation by the State Board of Professional Medical Conduct. *Id.* at 297 (citing N.Y. Pub. Health Law § 230(12)(a)). The Commissioner alone has the power to judge when a licensee constitutes an imminent public threat and to issue summary suspensions. *Id.* New York law requires a postdeprivation hearing to begin within ten days, but the Commissioner has the authority either to adopt the hearing committee's recommendation or to leave the summary order in effect pending a final resolution of the case. *Id.*

The *DiBlasio* court concluded that, because the statutory scheme arrogated "virtually unfettered" power to the Commissioner to issue summary suspensions, it lacked the procedural safeguards that are the hallmark of judicial proceedings. *Id.* at 299. Moreover, the right to a prompt postdeprivation hearing was rendered hollow by the Commissioner's "free[-dom] to ignore the hearing committee's recommendation." *Id.* ("[T]he hearing available under § 230, while providing an avenue for review of the charges themselves, provides no meaningful review of the summary suspension . . . .").

The Nevada scheme, of course, is very different. No autarchic commissioner-figure may impose summary suspensions by fiat, and only the state courts may reverse the results of disciplinary hearings. Consequently, *DiBlasio* has limited relevance to our analysis. By contrast, when our sister circuits

have confronted schemes similar to Nevada's, they have consistently granted absolute immunity to board members. *See Watts v. Burkhart*, 978 F.2d 269, 276-77 (6th Cir. 1992) (en banc) (holding that members of the Tennessee medical board were absolutely immune when they exercised summary suspension authority under a statutory scheme identical in all relevant respects to Nevada's); *see also Wang v. N.H. Bd. of Registration in Med.*, 55 F.3d 698, 700-02 (1st Cir. 1995) (granting absolute immunity to the members of New Hampshire's medical board, who summarily suspended the license of a physician who was subject to professional discipline in another state); *Horwitz v. State Bd. of Med. Exam'rs*, 822 F.2d 1508, 1515 (10th Cir. 1987) (holding that absolute immunity protected from civil liability members of the Colorado Board of Medical Examiners for summarily suspending a podiatrist's license).

**[9]** We are inclined to agree with these cases. Taken together, the *Butz* factors indicate that the exercise of summary suspension authority is comparable to a judicial act. This result also comports with a common-sense comparison of the Board Members with judges: the Board Members' summary suspension power is "directly comparable to the function performed by a judge in deciding whether to issue a temporary restraining order or preliminary injunction." *Watts*, 978 F.2d at 277. Accordingly, we hold that the Board Members are absolutely immune from liability for the exercise of that power.

### 2. *Failure to provide a prompt postdeprivation hearing.*

Buckwalter additionally argues that the Board Members should not be absolutely immune from liability for failing to provide him a prompt postdeprivation hearing. Buckwalter points out that to this day, he has still received no postdeprivation due process. The obvious objection is that Buckwalter voluntarily stipulated to postpone the hearing that the

Board was prepared to afford him. Buckwalter makes three responses.

First, he again asserts that the hearing was intended to address the merits of the malpractice claims, not the merits of the Board Members' judgment that he was an imminent danger to the citizens of Nevada. He insists that by stipulating to vacate the postdeprivation hearing he did not relinquish his right to a hearing on the merits of the summary suspension. As we have already explained, the question of whether the allegations in the administrative complaint were true is intertwined with the question of whether Buckwalter was a threat to public safety. Buckwalter was entitled to one postdeprivation hearing, not two.

Second, Buckwalter argues that the Board did not "promptly" institute a hearing when it unilaterally set a hearing date more than four months after the deprivation. Buckwalter is confusing the issue of whether the Board Members are entitled to absolute immunity with whether the Board Members deprived him of due process. If the Board Members were not immune from suit, we would face the question of whether the postdeprivation hearing the Board provided was sufficiently prompt to provide due process. *See, e.g.*, *Spiegel v. Ryan*, 946 F.2d 1435, 1442 (9th Cir. 1991).

**[10]** But, having decided that the Board Members are absolutely immune, it is clear that they were acting in a judicial capacity when they set the hearing date. *See Curry v. Castillo (In re Castillo)*, 297 F.3d 940, 951-53 (9th Cir. 2002) (holding that the scheduling of hearings by a bankruptcy trustee is a discretionary function protected by absolute immunity). The manner in which they set the hearing date is therefore irrelevant. *See Mishler*, 191 F.3d at 1006 ("The acts of the Nevada Board are no less judicial or prosecutorial because they may have been committed in error. It is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry . . . .")

(internal citation omitted). Once we have decided that an official enjoys absolute immunity from liability for a particular statutorily authorized action, any inquiry into the adequacy of the official's performance is foreclosed. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 928 (9th Cir. 2004).

Third, Buckwalter argues that he could not request a hearing because he was forced to continue to negotiate a settlement with the Board, lest he "anger[ ] them and risk[ ] draconian penalties." The record shows that Buckwalter was free to withdraw from the stipulation at any time. No evidence suggests that the Board would have refused to reinstate the hearing date. Buckwalter may now regret the months he spent in fruitless settlement negotiations, but it was his choice not to proceed to hearing. The Board should not bear the burden of Buckwalter's litigation decisions.

**[11]** The Board Members were acting within the scope of their judicial function when they set a hearing date following the summary suspension and when they stipulated with Buckwalter to postpone the hearing. They are absolutely immune from liability for those actions.

## B.   Younger *abstention.*

Absolute immunity is not a bar to injunctive or declaratory relief. *See Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984). The district court, however, held that *Younger* abstention required it to dismiss Buckwalter's equitable claims. We agree.[6]

---

[6]While this appeal was percolating, the Board voted unanimously to lift the summary suspension of Buckwalter's prescribing privileges. (He still faces a disciplinary hearing before the Board on the merits of the administrative complaint.) Buckwalter's prayer for an injunction to terminate the summary suspension is moot. *See Aiona v. Judiciary of Haw.*, 17 F.3d 1244, 1248 (9th Cir. 1994).

We conclude, however, that Buckwalter's case is not moot, for two reasons. First, because the disciplinary hearing has not yet occurred—

**[12]** *Younger* abstention requires federal courts to abstain from hearing claims for equitable relief as long as the state proceedings are ongoing, implicate important state interests, and provide an adequate opportunity to raise federal questions. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *Potrero Hills Landfill*, 657 F.3d at 882.

Buckwalter concedes that the Board's administrative process is ongoing (and that it was ongoing at the time he filed his complaint). He argues, however, that the administrative hearing will not address the merits of the summary suspension. As we have explained above, the Board's adjudication of the administrative complaint will necessarily resolve the merits of the summary suspension.

**[13]** The second *Younger* factor is not in dispute. It is self-evident that the Board's disciplinary proceedings implicate the important state interest of ensuring quality health care. *See Kenneally v. Lungren*, 967 F.2d 329, 331-32 (9th Cir. 1992); *see also Gibson v. Berryhill*, 411 U.S. 564, 576-77 (1973) ("[A]dministrative proceedings looking toward the revocation of a license to practice medicine may in proper circumstances command the respect due court proceedings . . . ."). And it is equally obvious that to substitute this court's judgment about the merits of the summary suspension for the Board's would interfere with Nevada's authority to regulate physicians practicing within its borders. *See Potrero Hills Landfill*, 657 F.3d at 883 ("The key to determining whether comity concerns are implicated in an ongoing state proceeding—and thus whether the second *Younger* requirement is met—is to ask whether

wherein the facts giving rise to the Board's judgment that Buckwalter was a threat to public safety will either be proven or rebutted—issuing declaratory relief at this juncture might at least have some effect on Buckwalter's reputation. *Id.* Second, Buckwalter seeks a separate hearing on whether he posed an imminent threat to the safety of the public. This claim for relief is not moot.

federal court adjudication would interfere with the state's ability to carry out its basic executive, judicial, or legislative functions.").

**[14]** The third factor is satisfied by the fact that Nevada courts may entertain federal questions when they review the Board's judgments. *See, e.g.*, *Minton v. Bd. of Med. Exam'rs*, 881 P.2d 1339, 1354-55 (Nev. 1994) (considering a federal due-process challenge to a license revocation). Should he lose in the disciplinary hearing, Buckwalter will have an adequate opportunity to raise his federal constitutional challenges on appeal. *See Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 ("[I]t is sufficient under *Middlesex* that constitutional claims may be raised in state-court judicial review of the administrative proceeding." (citation omitted)).

**[15]** The district court properly abstained from hearing Buckwalter's claims for equitable relief.

## IV.   Conclusion

We have previously held that the Board Members are functionally comparable to judges. *Mishler*, 191 F.3d at 1007. We now hold that the Board Members' exercise of their summary suspension authority is comparable to a judicial act. Hence, the Board Members are entitled to absolute immunity. The district court was correct to dismiss Buckwalter's claim for damages.

*Younger* abstention compels the dismissal of Buckwalter's remaining claims in equity. Buckwalter maintains that the Board exaggerated the risk that his professional conduct posed to the public and deprived him of his livelihood on flimsy evidence. Perhaps so. But the proper forum to challenge these allegedly improper actions was in an adversary disciplinary proceeding, which he could have demanded at

any time but steadfastly elected to postpone. Until the Nevada procedure has run its course, we have no role.

AFFIRMED.