# STATE OF MICHIGAN

# COURT OF APPEALS

BRUCE D. SERVEN,

        Plaintiff-Appellee,

v

HEALTH QUEST CHIROPRACTIC, INC.,
SILVIO COZZETTO, CHRISTOPHER DEAN,
RANDY WILCOX, MICHIGAN BUREAU OF
HEALTH PROFESSIONS- BOARD OF
CHIROPRACTIC, and QUEST HEALTH
SYSTEMS VI P.L.L.C., d/b/a HEALTH QUEST
OF BURTON,

        Defendants,

and

SOLOMON COGAN, THOMAS KLAPP, and
RONALD WILCOX,

        Defendants-Appellants.

FOR PUBLICATION
April 6, 2017
9:00 a.m.

No.   330983
Genesee Circuit Court
LC No.   2014-104032-CK

Before:  O'CONNELL, P.J., and GLEICHER and BOONSTRA, JJ.

PER CURIAM.

        Bruce Serven is a chiropractor who was disciplined by the Disciplinary Subcommittee of the Michigan Board of Chiropractic.  This Court reversed the subcommittee, holding that its order lacked legal and factual merit.  Serven then filed suit, alleging that the board members acted with self-interest and improperly penalized him.  As to part of Serven's claims, the circuit court denied the defendant board members' motion for summary disposition based on quasi-judicial immunity and qualified immunity as well as failure to state a claim upon which relief could be granted.  Because the board members were entitled to absolute immunity as quasi-judicial actors, we reverse and remand for dismissal of Serven's complaint.

-1-

# I. BACKGROUND

This case arises out of State Farm Insurance Company's retention of Bruce Serven, a licensed chiropractor, to perform an independent chiropractic examination (ICE) on AE. AE had been involved in a motor vehicle accident in May 2004, and two years later sought chiropractic treatment from Health Quest of Burton. Health Quest treated AE approximately three times weekly. At the time, Health Quest was owned, in part, by Solomon Cogan and Silvio Cozzetto. Cogan was also the chairman of the Michigan Board of Chiropractic. Defendants Thomas Klapp and Ronald Wilcox were members of the Michigan Board of Chiropractic Disciplinary Subcommittee.

Serven conducted a physical examination of AE and elicited his medical history. Serven concluded that AE was "not currently suffering from any type of musculoskeletal condition of spinal origin of causal relationship to the [subject] auto accident." In fact, Serven opined that AE's condition was "normal," negating the need for any further chiropractic services. Serven further advised State Farm that Health Quest's services provided to date were not "medically necessary for the injuries sustained in this accident." Based in part on this advice, State Farm denied payment for additional treatment to AE. Health Quest filed suit against State Farm seeking reimbursement; Serven and Cogan testified against each other during the trial. State Farm prevailed. Serven alleges that Cogan threatened him, "Obviously I need to see you on a higher level."

Shortly thereafter, Cogan's business partner, Cozzetto, filed a complaint against Serven with the Michigan Board of Chiropractic. Cozzetto noted that he was sent by his own insurer to Serven for an ICE following a 2000 car accident. Cozzetto alleged that Serven conducted chiropractic and orthopedic tests improperly, leading to an inaccurate report and termination of his insurance benefits. In relation to the current matter, Cozzetto indicated that his associate, Dennis Borja, had examined and treated AE. Cozzetto accused Serven of improperly rendering an opinion without reviewing Health Quest's records and acting outside the scope of his chiropractic license by considering records from medical care providers. The Attorney General subsequently filed an administrative complaint against Serven alleging that his behavior constituted negligence, incompetence, and lack of good moral character under the Public Health Code. See MCL 333.16221. The lack of good moral character allegation was based on Serven's alleged comment during the Board's investigation that Health Quest "had a track record of performing unnecessary treatment." The case was referred to an administrative law judge who determined that Serven was not negligent, incompetent, or lacking in good moral character and issued a proposal for a decision to this effect.

The Disciplinary Subcommittee of the Michigan Board of Chiropractic did not adopt the ALJ's proposal. At a March 15, 2012 meeting at which Cogan was present, the subcommittee instead found that Serven was negligent because he had not reviewed Health Quest's chiropractic records before issuing his opinion regarding the ICE. In addition, the subcommittee determined that it was "quite likely" that Serven made the comment that Health Quest "had a track record of performing unnecessary treatment," representing a lack of good moral character. The Board placed Serven on probation for one year. Serven appealed the disciplinary subcommittee's decision.

This Court held that the disciplinary subcommittee erred, reversed the decision, and remanded with instructions to expunge Serven's record. *Bureau of Health Professions v Serven*, 303 Mich App 305; 842 NW2d 561 (2013). We found the Board's conclusion that Serven was negligent legally unsound. Specifically, as an independent chiropractic examiner, Serven owed a duty to State Farm to gather information and provide advice, a duty which Serven fulfilled. Serven's only duty to AE was to not cause physical harm, and there was no allegation Serven had breached that duty. And Serven owed no duty to Health Quest. *Id*. at 309-310. This Court also rejected the subcommittee's conclusion that Serven's conduct amounted to a lack of good moral character. Serven's alleged comment regarding Health Quest during the Board's investigation was an "attempt[] to be candid" and was not publicized further than necessary. *Id*. at 310-311.

Thereafter, Serven filed this lawsuit against Cogan, Klapp, and Wilcox in their individual capacities, alleging claims of malicious prosecution, tortious interference with Serven's advantageous business relationships, abuse of process, and violations of Serven's due process and equal protection rights.[1] Defendants moved for summary disposition pursuant to MCR 2.116(C)(6), (C)(7) and (C)(8). The circuit court granted defendants' motion with regard to the constitutional and malicious prosecution claims but denied their motion with regard to Serven's claims for abuse of process and tortious interference. Defendants appeal, contending that the circuit court should have dismissed these claims as well.

## II. QUASI-JUDICIAL IMMUNITY

Defendants argue that they are entitled to quasi-judicial immunity because they are part of the Michigan Board of Chiropractic. Summary disposition is appropriate under MCR 2.116(C)(7) where "[e]ntry of judgment, dismissal of the action, or other relief is appropriate because of . . . immunity granted by law[.]" We review de novo a lower court's summary disposition ruling. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "A party may support a motion under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence," which is otherwise admissible. *Id.* We must review this evidence "in the light most favorable to the nonmoving party." *Denhof v Challa*, 311 Mich App 499, 510; 876 NW2d 266 (2015). "The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden*, 471 Mich at 119.

We begin our analysis with the doctrinal sire of quasi-judicial immunity—absolute judicial immunity. "It is well settled that judges are accorded absolute immunity from liability for acts performed in the exercise of their judicial functions." *Diehl v Danuloff*, 242 Mich App 120, 128; 618 NW2d 83 (2000). The purpose of absolute immunity is to "protect[] the finality of judgments and preserv[e] the judicial independence by 'insulating judges from vexatious actions prosecuted by disgruntled litigants.' " *Id.*, quoting *Forrester v White*, 484 US 219, 225; 108 S Ct 538; 98 L Ed 2d 555 (1988). "[T]he broad scope of the immunity . . . is 'for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with

---

[1] Serven raised unrelated claims against various other named defendants which are not at issue in this appeal.

independence and without fear of consequences.' " *Id.* at 129, quoting *Pierson v Ray*, 386 US 547, 554; 87 S Ct 1213; 18 L Ed 2d 288 (1967) (citations omitted). Accordingly, judges "are not liable to civil actions for their judicial acts even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley v Fisher*, 80 US (13 Wall) 335, 351-352; 20 L Ed 646 (1872). Absolute immunity is necessary because "controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree" and could cascade into a never-ending river of actions in other forums. *Butz v Economou*, 438 US 478, 512; 98 S Ct 2894; 57 L Ed 2d 895 (1978). And "safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Id*. For example:

> The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error. [*Id*.]

Quasi-judicial immunity "is an extension of absolute judicial immunity to non-judicial officers." Comment, *The Officer Has No Robes: A Formalist Solution for the Expansion of Quasi-Judicial Immunity*, 66 Emory LJ 123, 134 (2016). Quasi-judicial immunity "is available to those serving in a quasi-judicial adjudicative capacity as well as those persons other than judges without whom the judicial process could not function." *Maiden*, 461 Mich at 134 (quotation marks and citation omitted). In this vein, this Court has noted:

> The doctrine of quasi-judicial immunity as developed by the common law has at least two somewhat distinct branches: one branch focuses on the nature of the job-related duties, roles, or functions of the person claiming immunity, and one branch focuses on the fact that the person claiming immunity made statements or submissions in an underlying judicial proceeding. [*Denhof*, 311 Mich App at 510.]

In relation to the first branch, a quasi-judicial body subject to quasi-judicial immunity is defined as a board or commission with statutorily conferred power "to ascertain facts and make orders founded thereon" and "to exercise discretion of a judicial nature." *Midland Cogeneration Venture, LP v Nafalty*, 489 Mich 83, 91-92; 803 NW2d 674 (2011) (quotation marks and citations omitted).

In addition to the reasons posited for extending absolute immunity to judicial officers, quasi-judicial immunity is supported by:

-4-

(1) the need to save judicial time in defending suits; (2) the need for finality in the resolution of disputes; (3) to prevent deterring competent persons from taking office; (4) to prevent the threat of lawsuit from discouraging independent action; and (5) the existence of adequate procedural safeguards such as change of venue and appellate review. [*Diehl*, 242 Mich App at 131-132, quoting *Duff v Lewis*, 114 Nev 564, 569; 958 P2d 82 (1998) (quotation marks and additional citations omitted).]

Defendants contend that they are entitled to quasi-judicial immunity because in their Board positions, they acted as quasi-judicial adjudicators. The Board of Chiropractic is comprised of nine members, five chiropractors and four public members, tasked with "ascertaining minimal entry level competency of health practitioners and verifying continuing education during licensure." In addition, the Board must "take disciplinary action against licensees who have adversely affected the public's health, safety, and welfare." Michigan Board of Chiropractic, available at <http://www.michigan.gov/snyder/0,4668,7-277-57738_57679_57726-250191--,00.html> (accessed March 23, 2017).

Once a complaint is filed against a chiropractor, like the complaint filed by Cozzetto against Serven, the "Complaint Intake Section" of the Board reviews the allegations and determines if investigation is necessary. If an investigation is deemed necessary, a "trained investigation staff" member interviews the appropriate witnesses and collects evidence. If the investigator believes the challenged conduct "was below the minimal standards for the profession," the Board submits the matter to "an appropriate expert reviewer." If the expert substantiates the staff investigator's assessment, the Board requests the Attorney General to file a formal administrative complaint. What Happens After a Complaint is Filed?, available at <http://www.michigan.gov/lara/0,4601,7-154-72600_73836-365424--,00.html> (accessed March 23, 2017). In this way, the Board acts as police and prosecutor.

Formal administrative complaints are placed before an ALJ for a hearing. *Id*. Matters such as this are considered "contested cases." A contested case is "a proceeding . . . in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing." MCL 24.203(3). The evidentiary hearings in contested cases may be heard by ALJs, as was done in this case. An ALJ must act "in an impartial manner" and can be disqualified for "personal bias." MCL 24.279. But the ALJ is not the final arbiter. At the end of the hearing, the ALJ issues a proposed decision to which the parties may file exceptions. MCL 24.281(1). The disciplinary subcommittee issues the final order. It "may adopt, modify, or reject, in whole or in part, the opinion or proposal for decision of the [ALJ]." Mich Admin Code, R 338.1630(5). This final decision must be made "within a reasonable time" and must be supported by "competent, material and substantial evidence." MCL 24.285. In this regard, the ALJ acts like a magistrate or hearing referee and the Board's disciplinary subcommittee as the judge who renders a final decision.

That the disciplinary subcommittee acts as a judge is supported by "the job-related duties, roles, or functions" of the subcommittee's members. *Denhof*, 311 Mich App at 510. The subcommittee considers the evidence gathered, findings made, and conclusions rendered by an ALJ and reviews exceptions filed by the parties before rendering a final disciplinary decision. The system is akin to that in domestic relations matters, in which a Friend of Court referee

conducts the evidentiary hearing and recommends a resolution which must be considered and either entered or rejected by a circuit court judge. See MCL 552.507. The subcommittee "serv[es] in a quasi-judicial adjudicative capacity," *Maiden*, 461 Mich at 134, with duties similar to the circuit court in domestic relations matters.

Moreover, quasi-judicial immunity is frequently extended to a medical licensing board charged with hearing license suspension and revocation matters. *Watts v Burkhardt*, 978 F2d 269, 270-271 (CA 6, 1992). See also *Buckwalter v Nevada Bd of Medical Examiners*, 678 F3d 737 (CA 9, 2012); *Ostrzenski v Seigel*, 177 F3d 245, 249 (CA 4, 1999) ("Every court of appeals that has addressed the issue has concluded that members of a state medical disciplinary board are entitled to absolute quasi-judicial immunity for performing judicial or prosecutorial functions."). As a general proposition, the United States Supreme Court has held "that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process" to warrant immunity. *Butz*, 438 US at 512-513.

Cloaking the disciplinary subcommittee with absolute quasi-judicial immunity also serves public policy. Precluding civil suits against the members saves judicial time in repetitive appellate-type challenges against disciplinary decisions and enforces finality. Competent persons need not fear vexatious and harassing litigation arising from their official actions and are therefore more likely to agree to serve on disciplinary boards. Board members can act independently and without fear of repercussion for taking disciplinary action against an individual in the regulated field. See *Diehl*, 242 Mich App at 131-132. Ultimately, insulating board members protects the members and the judicial system from private lawsuits by chiropractors disgruntled by disciplinary action. See *Butz*, 430 US at 512. See also *Watts*, 978 F2d aqt 278, quoting *Bettencourt v Bd of Registration in Medicine*, 904 F2d 772, 783 (CA 1, 1990) (noting that " 'the act of revoking a physician's license . . . is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity apparent' "); *Vosburg v Dep't of Social Servs*, 884 F2d 133, 137 (CA 4, 1989) (extending quasi-judicial immunity to social workers who file petitions in child protective cases, in part, because "the chances are high that suits against social workers would occur with some degree of regularity" as "[p]arents, resentful of and humiliated by an attempt to usurp their rights, would likely channel their frustration" at "the State's advocate").

The entire process also bears "adequate procedural safeguards" to merit absolute immunity. *Diehl*, 242 Mich App at 132. First and foremost, when "all administrative remedies available within an agency" have been exhausted, the aggrieved party is entitled to direct judicial review by the courts. MCL 24.301. See also Const 1963, art 6, § 28 (requiring the opportunity for direct judicial review of administrative officers' judicial or quasi-judicial final decisions). Accordingly, the aggrieved party need not file a separate civil action to secure relief. Indeed Serven was vindicated by judicial review in this case.

Sufficient safeguards ensure that chiropractors against whom a complaint had been filed would be reviewed by unbiased arbiters. See *Butz*, 438 US at 512. Mich Admin Code, R 338.1604 has at all relevant times directed, "Any member of . . . a board . . . who takes an active part in the investigatory or allegation process shall not participate in deciding the contested case. . . ." Mich Admin Code, R 338.1605(3) grants the Board's chair, Cogan, power to appoint a replacement disciplinary subcommittee member if a previously named individual "is unable to

participate." This would include replacement of a member removed pursuant to Mich Admin Code, R 338.1604. Two years after Serven's disciplinary matter, MCL 333.16216a was enacted to clarify that anyone with a conflict of interest, such as "a personal or financial interest in the outcome," is subject to disclosure requirements. However, active efforts to protect against conflicts of interest were already in place and were sufficient to protect a respondent's rights.

Clearly, the safeguards against biased individuals deciding a disciplinary matter did not work in this case. Cogan was not a member of the disciplinary subcommittee, but he appeared at the subject meeting and participated in off-the-record discussions. This violated the spirit of then-MCL 333.16216(1), which provided that "[t]he chair of a board . . . shall not serve as a member of a disciplinary subcommittee."[2] Cogan was an equity partner in Health Quest and bore a financial interest in the outcome of Serven's disciplinary matter, and therefore should have played absolutely no role in the decision. The failure of the protective measures does not warrant a private lawsuit against the Board members, however. Absolute immunity does not fall away even when the judicial or quasi-judicial official acts "maliciously or corruptly." *Bradley*, 80 US (13 Wall) at 351-352.

The circuit court erroneously relied on *North Carolina State Bd of Dental Examiners v Fed Trade Comm*, ___ US ___; 135 S Ct 1101; 191 L Ed 2d 35 (2015), in denying immunity to defendants on conflict-of-interest grounds. *North Carolina* was based on a completely different, and much more narrowly drawn, immunity principle than that at play here.

In *North Carolina*, the state's Board of Dental Examiners investigated several dentist complaints to determine if nondentists could legally provide teeth whitening services. The complaints filed by the various dentists challenged the lower prices offered by nondentists for these services, but did not allege that any recipient of nondentist teeth whitening services had been harmed. The board was made up of seven dentists, one dental hygienist and one public member. It determined that teeth whitening fell within the practice of dentistry and therefore entered cease-and-desist letters against any and all nondentists providing such services or manufacturing teeth whitening products. *Id*. at 1108. The FTC filed a complaint against the state board and conducted an investigation, believing the board's conduct violated federal antitrust law by illegally interfering with free enterprise. *Id*. at 1108-1109.

Specific to antitrust litigation, the United States Supreme Court interpreted federal legislation "to confer immunity on anticompetitive conduct by States when acting in their sovereign capacity." *Id*. at 1110, citing *Parker v Brown*, 317 US 341; 63 S Ct 307; 87 L Ed 2d 315 (1943). *Parker* immunity is most often applied to "[s]tate legislation and decision[s] of a state supreme court, acting legislatively rather than judicially" as these "are an undoubted exercise of state sovereign authority." *North Carolina*, 135 S Ct at 1110 (quotation marks and citation omitted). *Parker* immunity is strictly limited, however, when the state delegates authority to a board controlled by "active market participants" because those members will always have a financial interest in anticompetition decisions and actions. *Id*. at 1111.

---

[2] This provision has since been relocated in MCL 333.16216(4). 2014 PA 413.

This case does not involve federal antitrust law. Therefore, the limited immunity conferred by federal antitrust legislation is inapplicable and irrelevant. The Board of Chiropractic is controlled by chiropractors with a ratio of five licensed chiropractors to four public members. When the disciplinary subcommittee revokes or suspends one chiropractor's license, that chiropractor's clients will likely move on and find another, competing chiropractor for services. Even so, the disciplinary action does not violate federal antitrust legislation; it conforms to state law to protect the public from unscrupulous or incompetent providers.

Moreover, defendants are not completely immune from any admonishment as there are internal governmental mechanisms for handling their alleged misconduct, adding another procedural safeguard. If defendants were elected state judges, Serven could have filed a grievance with the Judicial Tenure Commission, MCR 9.207(A), which may have led to disciplinary action. Here, Serven could have filed a complaint with the State Board of Ethics. Defendants are "public officers" as defined in MCL 15.341(c), as they were "appointed by the governor or another executive department official." In that role, defendants were required to use board personnel and resources for legitimate official purposes "and not for personal gain or benefit." MCL 15.342(3).[3] "Any person or entity . . . may file a complaint charging a public officer . . . with unethical conduct." State Board of Ethics Rules of Practice & Procedure, R 15.5(1), available at <http://www.michigan.gov/documents/mdcs/Ethics_Rules-web_485576_7.pdf> (accessed March 27, 2017). Accordingly, Serven was not without the means to bring public attention to defendants' alleged wrongdoing.

Ultimately, as the Board's disciplinary subcommittee was cloaked with absolute quasi-judicial immunity, the circuit court should have dismissed Serven's complaint against these defendants in its entirety. Given this resolution, we need not consider the remainder of defendants' appellate challenges.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Peter D. O'Connell
/s/ Elizabeth L. Gleicher
/s/ Mark T. Boonstra

---

[3] The state ethics act, MCL 15.341 et seq., does permit an aggrieved party to file a civil suit for damages. The action must be filed within 90 days of the subject occurrence. MCL 15.342c. Serven waited more than two years to file suit, well beyond the statutory limitation period.